UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LESTER LEMONS II,

       Plaintiff,

   v.                                  Case No. 16-cv-371-pp

ANDREW LARSON, GREGORY PETERSON,
DEREK SCHOUTEN, TIMOTHY PRICE,
NATHAN WOLF, DANIEL WINTERS,
NATHAN PACH, ZACHARY SWINGEN,
JASON ROSENTHAL, TERANCE LASH,
SEAN BADE, and MARK JENSEN,

       Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 42) AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 60)**

The plaintiff, who is representing himself, filed this lawsuit under 42
U.S.C. §1983, alleging that the defendants violated his constitutional rights.
Dkt. No. 1. On October 19, 2016, the defendants filed a motion for summary
judgment. Dkt. No. 42. On December 28, 2016, the plaintiff filed a motion for
summary judgment. Dkt. No. 60. The court will grant in part and deny in part
the defendants' motion, and will deny the plaintiff's motion.

## I.  RELEVANT FACTS[1]

### A.  Parties

During the events at issue, the plaintiff was in custody at Waupun Correctional Institution. Dkt. No. 43 at ¶1. Defendants Terance Lash, Sean Bade, Jason Rosenthal, Nathan Pach and Zachary Swingen were employed by the Wisconsin Department of Corrections (DOC) as correctional officers at Waupun. Id. at ¶¶3-4. Defendants Timothy Price, Derek Schouten, Daniel Winters, Gregory Peterson and Nathan Wolf were employed by the DOC as correctional sergeants at Waupun. Id. at ¶¶5-6. Defendant Andrew Larson was employed by the DOC as a lieutenant at Waupun, and defendant Mark Jensen was employed by the DOC as a nurse clinician 2 at Waupun. Id. at ¶¶7-8.

### B.  The Events Giving Rise to the Plaintiff's Complaint

On October 30, 2015, at about 8:40 p.m., Larson was working as the second shift line supervisor in the Restrictive Housing Unit. Id. at ¶9. Larson was on A-range, dealing with multiple inmates engaging in disruptive behavior. Id. Larson was notified (it is not clear by whom) that the plaintiff, who was housed in Cell A-109, was encouraging and directing other inmates to cover

_____

[1] The court takes the facts from the "Defendants' Proposed Findings of Fact." Dkt. No. 43. Under this district's local rules, those facts are deemed admitted for purposes of this decision because the plaintiff failed to respond to them. See Civil Local Rule 56(a)(1)(A) (E.D. Wis.). The court takes additional facts from "Defendants' Response to Plaintiff's Proposed Finding of Facts and Conclusions of Law." Dkt. No. 65. Because the plaintiff is representing himself, the court also has taken facts from the plaintiff's sworn complaint (dkt. no. 1); the Seventh Circuit has instructed district courts to construe a sworn complaint as an affidavit at the summary judgment stage. Ford v. Wilson, 90 F.3d 245, 246-47 (7th Cir. 1996). The facts are undisputed unless otherwise noted.

2

their cell door windows with paper and to make staff "suit-up." Id. Several inmates were doing what the plaintiff told them to do. Id.

The defendants explain that, when an inmate covers his cell window with paper, it impedes the staff's ability to check on the inmate's well-being and to verify that the inmate is still secured in his cell. Id. at ¶10.

Larson approached the plaintiff's cell; the window was covered and water was coming out from beneath the plaintiff's door. Id. Larson suspected that the plaintiff either was intentionally flooding his cell or that he had gained access to the "chase tunnel" that holds the water supply pipes and electrical supply lines to the cells and had somehow damaged the water supply line. Id.

Larson ordered the plaintiff to remove the paper from his cell window, "be placed into restraints, and removed from the cell." Id. at ¶11. The plaintiff refused, responding, "make em suit up you all, we riding out." Id. Larson told the plaintiff that he would come back with a cell extraction team if the plaintiff did not comply with Larson's orders. Id. The plaintiff again refused and responded, "suit up." Id.

Larson left, but he asked Peterson to stay and try to convince the plaintiff to voluntarily be placed in restraints and removed from the cell. Id. at ¶¶12, 34. According to Peterson, the plaintiff continued to state, "suit up" and "bring it." Id. at ¶34.

Larson assembled a pad-subduing team consisting of Wolf as Pad 1, Josh Bleiler (not a defendant) as Pad 2, Pach as team leader, Swingen as restraints officer, and Bade to document the event via video. Id. at ¶13. The

team returned to the plaintiff's cell, and Larson again asked the plaintiff to voluntarily comply with his orders. Id. at ¶14. Larson explained to the plaintiff the intervention options that he had brought with him, including the X-26P electronic control device, MK 9 O.C. fogger, pepperball delivery system, O.C. Protecto-jet and the cell extraction team. Id. Lason told the plaintiff about these options in the hope that the plaintiff would voluntarily comply. Id.

Larson again ordered the plaintiff to remove the paper from the window and to be placed in restraints. Id. at ¶15. The plaintiff did not respond. Id. "After several more attempts to gain [the plaintiff's] compliance," staff opened the trap door so that Larson could see the plaintiff. Id. Larson observed that the plaintiff was in the back right corner of his cell, under the desk. Id. Larson, who could not see the plaintiff's body, believed that the plaintiff had covered himself with his mattress linen, and blankets. Id.

Because the plaintiff was under a desk, with a mattress and linens in front of him, Larson decided that he could not use the X-26P taser or pepperball delivery system. Id. at ¶16. Larson also decided not to use incapacitating agents because the cell was flooded, and he believed the agents would make the walls and floor more slick, increasing the chance of injury to staff. Id. at ¶17.

Larson told the staff to prepare to enter the cell; Larson also informed the plaintiff that they were coming in. Id. at ¶18. Larson told the plaintiff that if he wanted to surrender, he should lay on his stomach with his hands out to his sides, palms up. Id. The staff opened the door, entered the cell, and removed

the mattress and linen so that they could place the plaintiff in restraints. Id. at ¶19. Wolf, who was assigned as Pad 1 officer on the extraction team, had the job of being the first to enter the cell and attempt to gain compliance. Id. at ¶48. The plaintiff states that Wolf punched him in the face, dkt. no. 65 at ¶5; Wolf denies doing so, dkt. no. 43 at ¶58.

According to the defendants, the plaintiff refused to be placed in restraints and resisted staff's attempts to control him by keeping his hands concealed under his stomach while he lay on the floor, and by kicking his feet out toward staff. Id. at ¶¶19, 64, 77, 90. The plaintiff disputes this assertion; he states that he surrendered as ordered by Larson. Dkt. No. 65 at ¶4.

Larson placed the X-26P taser on the plaintiff's lower back and ordered him to show his hands. Dkt. No. 43 at ¶20. The taser is designed to deliver an electrical shock by one of two ways: 1) it can be used in a drive stun mode, in which it delivers an electrical shock by use of the contact points on the front of the taser itself; or 2) it can be utilized with a cartridge that contains two probes, which are deployed into the body of the subject. Id. at ¶21. Both applications deliver a maximum charge of 50,000 volts. Id.

Larson was using the taser in drive stun mode. Id. When in drive stun mode, the electricity flows through the contact points, which are placed against the subject's skin or outer clothing. Id. at ¶23. Larson states that the plaintiff refused to comply with his order, so he activated the taser and stated, "taser, taser, taser, show me your hands." Id. at ¶20. The plaintiff disputes that he was not complying with Larson's orders. Dkt. No. 65 at ¶6. Larson asserts that

5

the taser didn't work because the plaintiff was twisting back and forth, preventing the taser from maintaining contact with the plaintiff's back. Dkt. No. 43 at ¶20. Larson then placed the taser on the plaintiff's upper back and again stated, "Show me your hands," and "taser, taser, taser." Id. at ¶25. Larson states that the plaintiff still did not comply, and was actively resisting attempts to place him in restraints by kicking outwards toward staff. Id. The plaintiff disputes this, explaining that he complied with Larson's orders. Dkt. No. 65 at ¶6.

Larson moved the taser back to the plaintiff's lower back and activated it for a third time, stating, "taser, taser, taser." Dkt. No. 43 at ¶26. This time, the plaintiff became compliant, and staff was able to secure his arms and feet with restraints. Id. at ¶¶26, 42, 54, 67. Larson asserts that he never placed the taser on the plaintiff's right arm or right leg, or on the left side of the plaintiff's face. Id. at ¶27. Peterson, Wolf and Pach do not recall seeing Larson use the taser on any body part other than the plaintiff's back. Id. at ¶¶43, 55, 68.

After the plaintiff was secured, staff escorted him to strip cell #1. Id. at ¶28. Pach secured the plaintiff's head in an effort to prevent the plaintiff from spitting at staff. Id. at ¶69. A staff-assisted strip search was performed, which yielded no contraband. Id. at ¶28.

Jensen medically cleared the plaintiff. Id. at ¶105. Jensen states that the plaintiff did not request any medical treatment; the plaintiff stated only that his left arm was numb because he had been tased, which, according to Jensen, is a common complaint after being tased. Id. at ¶¶99, 100. Jensen states that he

performed a visual assessment of the plaintiff and that the plaintiff was alert, his speech was clear and coherent, and he had no respiratory distress. Id. at ¶100. Jensen explains that his assessment was not meant to be a comprehensive assessment of the plaintiff's complaints, and if the plaintiff had had any obvious injuries such as open wounds, a bloody swollen lip, black eye or difficulty breathing, Jensen would have provided immediate care to the plaintiff. Id. Jensen asserts that the plaintiff did not request an inhaler and that he has no knowledge of the plaintiff's need for an inhaler. Id. at ¶101. Jensen's assessment of the plaintiff lasted forty-six seconds. Id. at ¶103.

The plaintiff states that, during the cell extraction, he suffered a scarred eye, busted lip, ligature marks[2] on his head, left arm, back, and left leg, and numbness in his left arm and hand. Dkt. No. 65 at ¶8. He asserts that he asked Jensen for medical treatment, but that Jensen refused. Id. at ¶9.

Schouten, Rosenthal, Winters, Price and Lash were not present during staff's extraction of the plaintiff from his cell, nor were they present during Jensen's medical assessment of the plaintiff. Dkt. No. 43 at ¶¶106-125.

Finally, while the defendants concede that the plaintiff had filed five offender complaints in the months prior to the incident, Schouten, Winters, Pach, Peterson and Wolf assert that they did not know at the time of the incident that the plaintiff had filed them. Id. at ¶126. They assert that, even if

---

[2] The court believes the plaintiff meant "signature marks" from the taser, rather than "ligature marks;" "ligature" marks are marks made by a rope or cord used to strangle someone.

they had known about the offender complaints, that would not have caused them to provoke or threaten the plaintiff. Id. at 127. Schouten, Winters, Pach, Peterson and Wolf allege that they did not take any actions prior to October 30, 2015 to provoke the plaintiff. Id.

## II.    DISCUSSION

### A.    The Plaintiff's Motion for Summary Judgment

On August 16, 2016, the court extended the dispositive motion deadline and ordered that, if a party wished to file a dispositive motion, it must do so by October 19, 2016. Dkt. No. 38. As noted, the defendants filed their motion for summary judgment on October 19, 2016. Dkt. No. 42. On November 17, 2016, the plaintiff asked the court to extend the deadline by which he was to respond to the defendants' motion. Dkt. No. 58. The court granted that request, and ordered the plaintiff to file his response materials by December 30, 2016. Dkt. No. 59. The plaintiff never requested an extension of time to file *his own* motion for summary judgment, and the court never extended the October 19, 2016 dispositive motion deadline.

On December 28, 2016, the plaintiff filed a combined motion for summary judgment and response to the defendants' motion for summary judgment. Dkt. No. 60. While the plaintiff's response to the *defendants'* summary judgment motion was timely, *his* summary judgment motion was not. The court will deny the plaintiff's motion for failure to abide by the court's deadlines. The court will consider the plaintiff's entire filing (including his brief

in support, dkt. no. 61, and his proposed findings of fact, dkt. no. 62) only in response to the defendants' motion for summary judgment.

B.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

9

C.   Analysis

    1.   *Personal Responsibility*

The Seventh Circuit repeatedly has explained that under §1983, an individual can be liable only if that individual is personally responsible for a constitutional deprivation. See Doyle v. Camelot Care Centers, Inc., 305 F.3d 603, 614-15 (7th Cir. 2002). Schouten, Rosenthal, Winters, Price and Lash were not present during the staff's extraction of the plaintiff from his cell, nor were they present during Jensen's medical assessment of the plaintiff. They cannot have been personally responsible for any deprivation of the plaintiff's constitutional rights that may have occurred during the incident. The plaintiff does not dispute this; in fact, he agrees that the court should dismiss his failure-to-intervene claims against Schouten, Rosenthal, Winters, Price and Lash. See Dkt. No. 61 at 10. The court will do so.

Similarly, the plaintiff states in response to the defendants' motion for summary judgment that he has no objection to the court dismissing his failure-to-intervene claim against Peterson, "because [Peterson] was not seen on camera therefore the plaintiff cannot say for sure whether he was on hand during the tasing." Id. In other words, the plaintiff concedes that, if Peterson was not present, he cannot be personally responsible for any constitutional deprivation that may have occurred during the incident. The court also will dismiss the plaintiff's failure-to-intervene claims against Peterson.

## 2. *Excessive Force Claims against Larson and Wolf*

"The Eighth Amendment does not forbid every use of force against a prisoner. What is prohibited is the wanton infliction of pain, and thus a use of force is constitutional if part of a good-faith effort to restore discipline." Mitchell v. Krueger, 594 Fed. App'x 874, 876 (7th Cir. 2014) (citing Whitley v. Albers, 475 U.S. 312, 379-21 (1986); Lewis v. Downey, 581 F.3d 467, 476 (7th Cir. 2009)). Only when "force [is] used sadistically for the very purpose of causing harm" will a defendant be liable. Mitchell, 594 Fed. App'x at 876 (citations omitted).

The parties agree that the plaintiff refused to comply with Larson's orders to uncover his window. In addition, the plaintiff does not dispute that prior to staff entering his cell, he refused to be voluntarily restrained through his door-trap. The defendants assert that the plaintiff's non-compliance continued until after Larson had tased the plaintiff three times. The plaintiff, however, says that he began to comply immediately after staff entered his cell. The plaintiff also says that despite his compliance with Larson's orders not to resist, Wolf punched him in the face and Larson tased him three times.

Because the court has denied the plaintiff's motion for summary judgment, the plaintiff is the non-moving party, which means the court must construe the facts in the light most favorable to him. Given that, the question is whether a reasonable jury could conclude that Wolf punching the plaintiff in the face and Larson tasing the plaintiff three times (even though the plaintiff

was not resisting and was complying with Larson's orders) was conduct performed "sadistically for the very purpose of causing harm."

If the only evidence presented to the court were the parties' conflicting statements, there would be a genuine dispute of material fact for a jury to decide. If a jury were to credit the plaintiff's version—that he was not resisting and that he was complying with Larson's orders—there would be no need for the type of force the plaintiff asserts Wolf and Larson used. See Fillmore v. Page, 358 F.3d 496, 504 (7th Cir. 2004) (noting that the infliction of pain is *per se* malicious if it is done "totally without penological justification"); Lewis v. Downey, 581 F.3d 467, 477-78 (7th Cir. 2009).

The parties' statements, however, are not the only evidence before the court. The defendants have provided a video of the incident, which they argue directly contradicts the plaintiff's version of the events. The Supreme Court has held that, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 378-81 (2007). The Seventh Circuit has indicated that not every movement must be captured on a video for a court to find that it blatantly contradicts a particular version. See Boyd v. Pollard, 621 Fed. App'x 352, 355-56 (2015) (stating, "We conclude that no juror who viewed the video could reasonably conclude—given the professional behavior of the guards and minor injury sustained by Boyd—that the guards, when outside the camera's view, attacked Boyd.") In that decision,

the court reemphasized that summary judgment is proper only if a jury *reasonably* could find excessive force after reconciling the entirety of the plaintiff's assertions with the video evidence. Id.

Viewing the video, it is clear that the correctional officers acted in a calm and professional manner throughout their interactions with the plaintiff. Larson provided ample opportunity for the plaintiff to comply with his orders before entering the cell, and he respectfully responded to the plaintiff's questions after leaving the cell. The correctional officers are calm and efficient, providing notice to the plaintiff when appropriate, so that he knew what they were doing and why they were doing it.

On the other hand, the video does not establish that Larson used the taser to compel the plaintiff to comply with his orders to stop resisting, because it is not clear from the video that the plaintiff was resisting. The plaintiff states that he surrendered when the correctional officers entered his cell; the defendants state that he did not. The video does not support either version, and, unlike in Boyd, the plaintiff's assertions about what is *not* shown in the video are not obviously contradicted or undermined by what *is* shown in the video. In short, there is a genuine factual dispute over whether the plaintiff failed to comply with Larson's orders after staff entered the plaintiff's cell. The court will deny summary judgment as to Larson on the plaintiff's excessive force claim against him.

The same cannot be said for the plaintiff's excessive force claim against Wolf. The plaintiff asserts that Wolf punched him the face; Wolf asserts that he

13

did not. After viewing the video, the court concludes that no jury could reasonably conclude that the plaintiff's version is true. Although the plaintiff's body is not visible in the video, the defendants' bodies are. It is not clear to the court who is who in the video, but it is clear that *none* of the people in the video make any striking motions. The video also contradicts the plaintiff's assertions that his eye was swollen and scarred and that he complained to the defendants or to the nurse about being punched in the face. The only complaints the plaintiff makes are about his breathing and the pain in his shoulders/arms. Because the video directly contradicts the plaintiff's account of Wolf's use of force, the court finds that Wolf is entitled to summary judgment on the plaintiff's excessive force claim.

### 3. *Failure-to-Intervene Claims against Wolf, Swingen, Pach, and Bade*

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under §1983 if that officer had a reason to know . . . that excessive force was being used . . . *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." Yang v. Hardin, 37 F.3d 282 (7th Cir.1994). The court of appeals has stated that "a realistic opportunity to intervene may exist whenever an officer could have called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop." Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005) (citations omitted). The same court has made clear that this analysis almost always implicates questions of fact for the jury. Id. (quoting Lanigan v. Vill. of E. Hazel Crest, Ill., 110 F.3d 467, 478

(7th Cir. 1997) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.")).

The court finds that, should a jury credit the plaintiff's version, it could reasonably conclude that Wolf, Swingen, Pach and Bade (all of whom were in close contact with the plaintiff) had reason to know that Larson was using excessive force (*i.e.*, by tasing the plaintiff three times even though he was complying with Larson's orders and not resisting), *and* that they had a realistic opportunity to intervene in Larson's use of force. As shown on the video, Larson called out "taser, taser, taser" each time prior to deploying the taser. Construing the facts in a light most favorable to the plaintiff (the non-moving party), Wolf, Swingen, Pach and Bade could have told Larson to stop using the taser or, at the very least, they could have protested that the plaintiff was not resisting, to flag for Larson that using the taser was unnecessary. Because the court has concluded that the plaintiff's excessive force claim against Larson survives, the associated failure-to-intervene claims against Wolf, Swingen, Pach and Bade also survive.

4.    *Deliberate Indifference to Serious Medical Needs*

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997) (citations omitted). This standard contains

both an objective element (that the medical needs be sufficiently serious) and a subjective element (that the officials act with a sufficiently culpable state of mind). Id.

In the plaintiff's response to the defendants' motion for summary judgment, he states, for the first time, that the defendant officers demonstrated deliberate indifference to his serious medical needs when they handcuffed his hands behind his back, despite the fact that he has a cuff-in-front restriction due to nerve damage in his arm. Dkt. No. 61 at 10. The court will not address this new aspect of the plaintiff's deliberate indifference claim, because the plaintiff did not raise these allegations in his complaint and he cannot do so for the first time in response to a motion for summary judgment. See Anderson v. Donahoe, 699 F.3d 989, 997 (7th Cir. 2012) (holding that a plaintiff waives new claims raised for the first time in opposition to summary judgment). Because the plaintiff did not provide the defendants with the required notice, he has waived this aspect of this claim.

The plaintiff also complains that Jensen demonstrated deliberate indifference to his serious medical needs because Jensen conducted only a cursory examination of him that lasted less than a minute. Dkt. No. 61 at 35. The plaintiff asserts that he informed Jensen that he needed his asthma inhaler and that he had a swollen eye, open marks from the taser, and a numb arm. Id.

Even construing the facts in a light most favorable to the plaintiff (the non-moving party), the court finds that the plaintiff has to raise a genuine

dispute of fact as to whether his medical needs were sufficiently serious to implicate the Eighth Amendment's protections. The video contradicts the plaintiff's claims that he had a swollen eye and open wounds, and, while it is true that the plaintiff had labored breathing immediately after the cell extraction, the video demonstrates that his breathing was under control and normal by the time Jensen arrived to evaluate him. The video also confirms Jensen's assertions that the plaintiff did not request any medical help from him, nor did he ask Jensen for his inhaler.

Finally, Jensen explains that "numbness is common after the use of a tazer," dkt. no. 45 at ¶8, which explains why he did not provide the plaintiff any treatment for that complaint. But, even if it weren't a common consequence, not every "ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." Gutierrez v. Peters, 111 F.3d 1364, 1372 (7th Cir. 1997). "A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution." Id. (quoting Cooper v. Casey, 97 F.3d 914, 916 (7th Cir. 1996); Oliver v. Deen, 77 F.3d 156 (7th Cir. 1996) (a mild case of asthma which allegedly was exacerbated by second-hand tobacco smoke did not rise to the level of seriousness sufficient to support a claim for relief)). Accordingly, Jensen is entitled to summary judgment, and the court will dismiss him as a defendant.

5. *Retaliation*

To prevail on a First Amendment retaliation claim, the plaintiff must show that (1) he engaged in an activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action. <u>Bridges v. Gilbert</u>, 557 F.3d 541, 546 (7th Cir. 2009). "A motivating factor is a factor that weighs in the defendant's decision to take the action complained of—in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." <u>Hasan v. U.S. Dep't of Labor</u>, 400 F.3d 1001, 1006 (7th Cir. 2005). Once a plaintiff shows that an improper purpose was a motivating factor, the burden shifts to the defendants to prove that the same actions would have occurred even in the absence of the protected conduct. <u>Greene v. Doruff</u>, 660 F.3d 975, 979 (7th Cir. 2011).

The plaintiff asserts that he filed inmate grievances against Larson, Wolf and Pach following "an illegal staff assisted strip search." Dkt. No. 61 at 35. He states that this occurred just a few months prior to the events at issue. The plaintiff also asserts that it is well known that correctional officers and staff "harass others at another's behest." <u>Id.</u> These unsupported assertions are insufficient for plaintiff to satisfy his burden at summary judgment.

The parties agree that the plaintiff engaged in protected activity when he filed inmate complaints against various prison officials (some who are defendants, some of whom are not). But it is not clear how the plaintiff links

the defendants' actions to these complaints. Perhaps the plaintiff intends to imply that because he had filed these complaints, Larson unnecessarily tased him when removing him from his cell, and the others did nothing to intervene.

The problem with the plaintiff's argument (if that is, in fact, the plaintiff's argument) is that, according to the defendants, inmate complaints are confidential. Dkt. No. 57 at 16. As a result, Schouten, Winters, Pach, Peterson and Wolf assert that they did not know that the plaintiff had filed inmate complaints about their conduct (or, presumably, anyone else's conduct). The plaintiff does not dispute the defendants' assertions. He offers no evidence suggesting that he informed the defendants that he had filed inmate complaints about their conduct, or that they somehow learned that he had filed inmate complaints despite the confidential process. If the defendants did not know about the inmate complaints, then the filing of those complaints could not have motivated any alleged retaliatory action. In other words, no jury could reasonably conclude that these defendants retaliated against the plaintiff, given that the defendants were not even aware that there was a reason to retaliate. The court will dismiss the plaintiff's retaliation claims.

## III.   NEXT STEPS

As of November 18, 2016, the plaintiff was housed at the Waupun Correctional Institution. He is no longer there. According to the DOC Inmate Locator (available at https://appsdoc.wi.gov/lop/home.do), the plaintiff is not in the custody of the DOC. The court has no contact information for the plaintiff; he has not contacted the court since December 28, 2016.

On March 2, 2016, the court informed the parties that they are required to notify the Clerk of Court of any change in address. Dkt. No. 20 at 14. The reason underlying this requirement is obvious: When communication between the court and the parties breaks down, the case comes to a standstill. That is where we now find ourselves. Although some of the plaintiff's claims have survived summary judgment, the court is unable to communicate its decision to the plaintiff, and this case cannot proceed to the next phase without him.

Civil L.R. 41(c) allows a court to dismiss a case if it appears to the court that the plaintiff is not diligently prosecuting it. The plaintiff's failure to update the court with his current address suggests that he is no longer interested in prosecuting this case. The court will give the plaintiff ninety days from the entry of this order to inform the court of his current address. If he fails to do so, the court will dismiss this case with prejudice and without further notice to him based on his failure to diligently prosecute it.

## IV.    CONCLUSION

The court **ORDERS** that the plaintiff's motion for summary judgment is **DENIED**. Dkt. No. 60.

The court **ORDERS** that the defendants' motion for summary judgment is **GRANTED** as to defendants Schouten, Rosenthal, Winters, Price, Lash, Peterson and Jensen. Dkt. No. 42. The court **DISMISSES** those defendants.

The court **ORDERS** that the defendants' motion for summary judgment is **GRANTED** as to defendants Wolf and Pach on the plaintiff's retaliation

claims and as to defendant Wolf on the plaintiff's excessive force claim. Dkt. No. 42. The court **DISMISSES** those claims against those defendants.

The court **ORDERS** that the defendants' motion for summary judgment is **DENIED** as to defendant Larson on the plaintiff's excessive force claim and as to defendants Wolf, Swingen, Pach and Bade on the plaintiff's failure-to-intervene claims. Dkt. No. 42.

The court **ORDERS** the plaintiff to update the court with his current contact information within ninety days of entry of this order. If he does not, the court will dismiss this case with prejudice based on his failure to diligently prosecute it.

Dated in Milwaukee, Wisconsin this 13th day of September, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**